UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ROBIN LOVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-01725-TWP-MG |
| | ) | |
| STATE BANK, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed by Defendant State Bank (Filing No. 39). Plaintiff Robin Love ("Love") filed a four-count Complaint against her former employer, State Bank, alleging claims of race discrimination and retaliation (Filing No. 32). State Bank now seeks dismissal of all of Love's claims. For the reasons explained below, State Bank's Motion is **granted**.

## I.    BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Love as the non-moving party. *See Zerante v. DeLuca,* 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

Love is a Black woman who previously served as the Accounting Director at LEL Home Services, LLC, where she managed all aspects of financial administration and accounting operations (Filing No. 49-7 at 1). Love holds a Master of Business Administration degree from Indiana Tech, a Bachelor of Business Administration degree from Indiana University East, and an Associate General Studies degree from the City College of Chicago. *Id.*

On August 18, 2022, Love applied for the Controller position at State Bank (Filing No. 49-1 at 16:24-17:2).[1] The Controller manages State Bank's Accounting Department (which consisted of the Controller and a Staff Accountant) and reports to State Bank's Chief Financial Officer, David Bratton ("Bratton"). (Filing No. 40-1 at 4). The Controller directs all the accounting/financial activities of State Bank, and the position's duties include leading the development, implementation, and monitoring of State Bank's income statement and balance sheet management strategies. *Id.* The Controller manages and oversees all functions of the Accounting Department and performs the following essential duties:

> (1) Review financial and other reports that are presented to the Board of Directors; (2) Direct preparation of reports, which summarize and forecast company business activity and financial position in areas of income, expenses, and earnings, based on past, present, and expected operations; (3) Review the Allowance for Loan Loss calculation; (4) Direct the capital expenditure and corresponding fixed asset tracking process; (5) Direct and review reports required by regulatory agencies; (6) Create and review management reports as needed; (7) Oversee the accounts payable process; (8) Manage the annual audit and participate in the periodic examinations with regulators and outsourced internal auditors; (9) Review year-end tax return filings and payments; and (10) Collaborate with colleagues on strategic initiatives and projects.

*Id.* The Controller is also supposed to supervise the Staff Accountants and maintain quality control throughout various accounting processes (Filing No. 40-1 at 5). Staff Accountants are required to be familiar with accounting tasks and perform various accounting responsibilities. *Id.* The Staff Accountant position is a lower-level position and is expected to have less in-depth knowledge of accounting principles and requires greater oversight than the Controller. *Id.*

Love was first interviewed by phone by State Bank's Vice President of Human Resources, Dana Howard ("Howard") (Filing No. 49-1 at 22:5-8). During the phone interview, Love represented that she had the necessary experience for the Controller position (Filing No. 40-5 at

---

[1] For several deposition transcripts, the deposition page numbers do not match the ECF page numbers. Thus, the Court will refer to the ECF page numbers when citing deposition transcripts.

15). Then, Love was interviewed by Bratton (Filing No. 49-1 at 21:1-2). While she did not have banking experience, Bratton assured Love that her lack of banking experience would not be an issue. *Id.* at 32:19-33:2. Bratton had come from different industries prior to joining State Bank and believed that the accounting skills and experience Love represented would translate and that she could be trained on the banking-specific parts of the Controller role (Filing No. 40-1 at 5). Most of the Controller's job is industry-neutral, not banking-specific, such as general ledgers, balance sheets, financial statements and application of accounting principles. *Id.* Bratton offered the Controller position to Love because of her resume, accounting background, and because Love interviewed well. *Id.* at 5–6. After some negotiation, the parties agreed on an annual salary of $100,000.00 (Filing No. 49-1 at 27:2-3).

Love began working for State Bank on October 3, 2022. *Id.* at 84:11-14. Once she began working as the Controller for State Bank, she received training from Katie Hardwick ("Hardwick"), who had performed both Controller and Staff Accountant duties for State Bank prior to Love's hiring (Filing No. 40-1 at 7). This training included Hardwick showing Love various tasks outlined by Bratton that would need to be regularly completed by the Controller. *Id.* Love also received between five and seven total hours of training from Bratton (Filing No. 49-8 at 2).

In Love's first week of employment, Bratton trained Love on preparing a report called the "Daily," which shows trends and metrics for State Bank (Filing No. 40-1 at 9). Bratton considered preparing the Daily to be an entry-level accounting task but found that it took Love multiple days to understand the task and complete it accurately (Filing No. 40-2 at 26:12-18). Bratton also found that Love was unable to properly prepare a report for the Board of Directors and had to review her mistakes. *Id.* at 26:21-27:4.

But Love also received several positive remarks concerning her work performance. On October 7, 2022, Love completed the Daily Earnings report, and Bratton approved her submission of the report (Filing No. 49-21 at 1). On October 11, 2022, she completed "Batch 2/3," and Bratton told her, "nice work!" (Filing No. 49-20 at 1). On October 12, 2022, Love completed a GL Suspense Report and, although changes were needed, Hardwick said the changes could have been due to a miscommunication on Hardwick's part (Filing No. 49-17 at 1). Love also completed an extension request letter for the Indiana Attorney General's office and received praise from Bratton for the letter (Filing No. 49-19 at 1). On November 2, 2022, Love completed cash receivables, and Bratton told her, "Good work!" (Filing No. 49-16 at 1). On November 8, 2022, Bratton reviewed the Daily report prepared by Love and commented, "everything is correct—good job." (Filing No. 49-12 at 1). On December 15, 2022, Love completed the Unclaimed Property Report and Bratton said, "nice work." (Filing No. 49-13 at 1).

Stephanie Johnson ("Johnson"), a Caucasian woman, was hired as the Staff Accountant in November 2022 (Filing No. 40-1 at 10). When Johnson was hired, Hardwick stopped providing Love with any form of training. Johnson received daily training for a month amounting to roughly sixty to one hundred twenty hours total (Filing No. 49-8 at 2). Love asked Bratton for training, but Bratton would either tell her he did not have the time or that he was too busy. Sometime after November 2022, Love told Howard that she was being treated differently than her co-worker, Johnson, and Howard relayed this concern to Bratton (Filing No. 49-2 at 16:2-17). Neither Love nor Howard ever mentioned race when discussing this complaint. *Id.* Later, Love met with Howard and Danisha Butler to discuss their experiences as Black employees at State Bank, and Love

explicitly told Howard that she was being discriminated against due to her race (Filing No. 49-1 at 99:14-21).[2]

On one occasion, Bratton and Hardwick came into Love's office, and Hardwick voiced concerns that Bratton was not catching on quickly enough. Bratton then went through the list of the Controller's daily tasks and confirmed that Love was completing them despite the lack of training. Bratton said that Love was "where [she] needed to be." (Filing No. 49-8 at 2).

In December 2022, Bratton discovered that Love had stopped making a general ledger entry, a document evidencing State Bank's liquidity position for each day, without informing him (Filing No. 40-1 at 9). When Bratton discussed this with Love, she told him it was not a big deal, and that pursuant to Bratton's request to find inefficiencies, the omission of such report was to improve efficiency. *Id.* Also in December 2022, Love double-paid interest to Northern Trust, a larger bank that provides wholesale funding, and did not take any action to correct the error. *Id.* at 12. Bratton had to contact Northern Trust and get State Bank's money returned. *Id.*

In January 2023, Love was due for a ninety-day review. Given the issues Bratton was having with Love, he decided to give her a Record of Counseling and a thirty-day Performance Improvement Plan (the "Counseling and Action Plan"). *Id.* at 12. Bratton told Howard that he was skeptical that Love had the requisite skills for the Controller position. *Id.* Bratton discussed the Counseling and Action Plan with Howard before it was presented to Love. *Id.*

On January 5, 2023, Bratton, Howard, and Love had a meeting where Bratton and Howard presented Love with the Counseling and Action Plan (Filing No. 49-1 at 52:11-25). The Counseling and Action Plan listed approximately eleven instances in which Bratton and Howard believed Love

---

[2] Howard denies that Love complained to her about race discrimination from Bratton (Filing No. 49-5 at 12). However, at this stage of the proceedings, the Court considers the evidence in the light most favorable to Love.

had failed to meet State Bank's expectations for the Controller position (Filing No. 40-1 at 34).

The Counseling and Action Plan stated,

> Based on the information listed above the decision is to put [Love] on a 30 plan. Within these 30 days if [Love] has not conformed to performing the required duties to the fullest the result would be up to termination. We will continuously review [Love's] progress and will follow-up by or before February 6, 2023.

*Id.* at 35. Bratton explained his concerns about Love's work, including that she did not seem to understand certain basic accounting functions. *Id.* at 12. Love acknowledged some of her shortcomings and expressed that she had not been given any warning, and if Bratton would just train her or show her some of those things then she might understand. *Id* at 12–13. Bratton averred that he "was very busy as both the CFO and COO and did not expect that [he] would have to train Love with regard to her accounting skills." *Id.* at 13.

Bratton told Love that she could either be placed on the Counseling and Action Plan or accept a demotion to a Staff Accountant position (Filing No. 49-1 at 37:21-23). Love declined the demotion and told Bratton that she would like the opportunity to make whatever corrections to her performance she needed to. *Id.* at 55:1-11. Love submitted a detailed written commentary/response to the Counseling and Action Plan that she received, in which she did not deny that she made errors but offered explanations. *Id.* at 59:5-19. Love summarized that "I was not made aware, nor did I have any indication that my job was at risk until 01/05/2023 and my start date was 10/03/2023. I received no verbal warnings, counseling or additional training in the areas I lack as detailed by my supervisor." (Filing No. 40-3 at 30). Love made no mention of race discrimination during the meeting or in her commentary/response (Filing No. 49-1 at 57:24-58:1).

Later that day, in the afternoon of January 5, 2023, Love had still not set up access to the auditor portal for the audit starting that day and had not uploaded the items assigned to her (Filing No. 40-1 at 13). On January 6, 2023, Love completed a loan and investment monthly report

inaccurately. On January 9, 2023, Love produced a financial statement containing errors. *Id.* On January 10, 2023, Love showed up at 9:30 a.m. for a 9:00 a.m. meeting that was scheduled for thirty minutes. *Id.* On January 17, 2023, Love recorded a tax receipt incorrectly, which Johnson caught. *Id.* On January 18, 2023, Love double-booked an interest expense, and Bratton had to show her how to reconcile the financial statement. *Id.* at 14.

On January 19, 2023, at 11:00 a.m., Love texted Howard that Bratton made time to train Johnson but was not providing the same training to Love, and it frustrated her that Bratton would claim that she was not meeting expectations (Filing No. 49-10 at 1-2). Love stated, "[i]t's so frustrating being made to feel like a slave in this day and age." *Id.* at 1. Love also stated that she had already made calls and if she is terminated, she is "prepared to take it all the way." *Id.*

Later that day, at approximately 1:45 p.m., Bratton and Love had a conversation about how she was doing concerning the Counseling and Action Plan (Filing No. 40-4 at 56). Bratton told Love that he liked her attitude, and that she was receptive to feedback, but she lacked the some of the necessary knowledge required to remain as the Controller. *Id.* Bratton explained that Love needs more experience and training, and he doesn't have the time to spend with her. *Id.* Bratton emphasized  to Love how much he liked her, how brilliant he thinks she is, how he loves the story that she shared during her interview of how hard she worked to become the person she is today— and he knows Love will be great in a couple of years—but he does not feel Love was qualified for the Controller role. *Id.* Bratton offered to continue to be a mentor and support Love through her next position but told Love that he still did not believe she was qualified for the Controller position. *Id.* Bratton again gave Love the choice between a demotion to the Staff Accountant position with reduced pay of $86,000.00 annually or resignation with six weeks' severance pay. *Id.*

In her memorialization of this meeting, Love wrote that "I have witnessed my subordinate, Stephanie Johnson, receive an extensive amount of training from both Katie and David since the first day she started on 11/29, however every time I have requested training I am told by David that he doesn't have time and by Katie that she doesn't know the answer." *Id*. Again, there was no mention of race or discrimination during this meeting or in Love's memo. ([Filing No. 49-1 at 131](#)).

On January 23, 2024, Love requested a $90,000.00 salary but Bratton informed Love that he was not able to get her request approved ([Filing No. 40-4 at 70](#)). Love again declined the Staff Accountant position, and her employment was terminated. ([Filing No. 49-1 at 69](#):15-18. Love did not mention race or discrimination during this meeting. *Id.* at 71:19-22.

After Love was terminated, Bratton took over the Controller responsibilities and a year later, Johnson was hired for the Controller position ([Filing No. 49-5 at 6](#)).

## II.    LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation

and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

## III.    DISCUSSION

In her four-count Complaint, Love asserts claims for Count I: race discrimination in violation of Title VII, 42 U.S.C. § 2000e ("Title VII"); Count II: retaliation for engaging in protected activity in violation of and Title VII; Count III: race discrimination in violation of 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991 ("§ 1981"); and Count IV: retaliation for engaging in protected activity in violation of § 1981 (Filing No. 32).

Title VII prohibits employers from discriminating against a person with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race. *Gamble v. Cnty. of Cook*, 106 F.4th 622, 625 (7th Cir. 2024) (quoting 42 U.S.C. § 2000e-2(a)(1)). "Under Section 1981, '[a]ll persons within the jurisdiction of the United States shall have the same

right . . . to the full and equal benefit of all laws . . . as enjoyed by white citizens[.]'" *Id.* (quoting 42 U.S.C. § 1981) (alterations and omissions in original). "The legal analysis for discrimination claims under Title VII and § 1981 is identical," so the Court merges the discussion of Counts I and III. *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 904 (7th Cir. 2015). Likewise, the same standard is applied for retaliation claims under Title VII and § 1981, and the Court will also merge the discussion of Counts II and IV. *Stephens v. Erickson*, 569 F.3d 779 (7th Cir. 2009). The Court will first address Love's two race discrimination claims before turning to her two retaliation claims.

**A.    Race Discrimination Claims**

State Bank argues it terminated Love based on her performance, thus the Court could skip the *McDonnell Douglas prima* facie analysis. "We may skip the *McDonnell Douglas* prima facie analysis if the employer raised the employee's performance is the reason for the adverse employment decision." *Vichio v. US Foods, Inc*, 88 F.4th 687, 691 (7th Cir. 2023). However, because the parties conducted their analysis under *McDonnell Douglas*, the Court will do so in this Order. Love may establish a dispute of material fact under the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or  she can succeed if the evidence, when considered as a whole, would permit a reasonable factfinder to conclude that State Bank discriminated against Love because she is Black. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016).

The *McDonnell Douglas* framework "requires the plaintiff to carry the burden of production on a four-part prima facie case." *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 500 (7th Cir. 2017). Love must show that (1) she is a member of a protected class; (2) she performed her job to her employer's expectations; (3) she suffered an adverse employment action; and (4) one or more similarly situated individuals outside her protected class received better

treatment. *Id.* If Love makes this prima facie showing, the burden shifts to State Bank to come forward with a legitimate, nondiscriminatory reason for the challenged employment action. *Id.*; *Smith*, 806 F.3d at 905. If State Bank does this, then the burden shifts back to Love to establish a genuine dispute of fact about whether State Bank's reasoning was pretext for discrimination. *Id.* "'Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action.'" *Smith*, 806 F.3d at 905 (quoting *Wolf v. Buss (Am.) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996)) (internal quotation marks omitted). "Summary judgment for [State Bank] is appropriate if [Love] fails to carry [her] burden to establish a prima facie case or is unable to show a genuine dispute about whether the neutral reason advanced by [State Bank] was merely pretextual." *Id.*

State Bank concedes that Love establishes the first and third elements of a prima facie case—she is a member of a protected class, and she suffered an adverse employment action (Filing No. 41 at 22). State Bank argues, however, that Love has failed to establish a prima facie case for discrimination under the *McDonnell Douglas* framework for three reasons: (1) Love cannot show that she performed the job to Bratton's expectations; (2) Love cannot point to a similarly situated individual outside of her protected class that received better treatment; and (3) Love cannot show that Bratton's reason for terminating her employment is pretext for discrimination. *Id.* The Court will address each argument in turn.

### 1. **State Bank's Expectations**

State Bank argues that Love's self-serving belief that she performed her job well does not raise a genuine dispute of material fact on the issue of whether her performance was meeting her employer's expectations. Rather, it is State Bank's, and therefore Bratton's, belief about whether Love was performing well (Filing No. 41 at 22-23). "[I]t is the perception of the decisionmaker,

not the employee, that is relevant." *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 398 (7th Cir. 1998). State Bank designates significant evidence to show that Bratton observed many performance issues indicating that Love was unable to effectively perform the Controller duties.

Despite these designations, Love argues that she consistently completed her tasks, and designates the emails of Bratton praising her work to show that her performance met State Bank's expectations (Filing No. 49 at 23). Love points out that she was not aware of all the alleged issues with her performance until she was written up on January 5, 2023, and contends there is no documented evidence of significant performance deficiencies prior to the January 5, 2023, Counseling and Training Plan.

The Court is not persuaded by Love's response because the designated evidence does not support her assertion that she was meeting her employer's expectations. State Bank is correct that an employee's self-serving statements or belief that she performed well does not raise a genuine dispute of material fact as to whether she was meeting her employer's expectations. *Sirvidas v. Commonwealth Edison Co.*, 60 F.3d 375, 378 (7th Cir. 1995). Rather, it is the perception of the decision maker, Bratton that matters. *Adreani*, 154 F.3d at 398. It is true that Bratton offered compliments and encouragement to Love on some aspects of her performance. However, Bratton also testified that Love was unable to properly complete any yield reports during her employment at State Bank. Hardwick reported to Bratton that Love was confusing debits and credits when reconciling accounts (Filing No. 40-1 at 8). Hardwick also informed Bratton that Love continued to struggle to properly balance State Bank's primary bank partner's account. *Id.* In addition, the Counseling and Action Plan outlines at least eleven performance-related events where Bratton observed performances by Love that were below his expectations. Bratton then observed more

performance issues after the Counseling and Action Plan, with the new issues ultimately leading to Love's termination.

The Court acknowledges the various emails where Bratton provided praise (*see* Filing No. 49-12 through Filing No. 49-23). However, the fact that Love could satisfy some of her duties as Controller does not mean she performed her job to her employer's expectations. The emails do not rebut the many failures in performance evidenced by State Bank. Love admits that she made mistakes but felt that she was not "given grace" for her errors (Filing No. 49-1 at 98). Love does not deny that she: stopped making a general ledger entry that documents State Bank's liquidity position for the day without informing Bratton (Filing No. 49 at 13); left work early without approval, *id.* at 14; took several days to complete a bookkeeping assignment concerning State Bank's tax accounts and returned the work in an incomplete and incorrect state, *id.*; and failed to complete three end-of-day tasks on December 30, 2022, and did not inform Bratton of the incomplete tasks when she called in sick on January 3, 2023, *id.* at 15. Moreover, Love does not dispute that she double-paid interest to Northern Trust in December 2022 without taking any action to correct the matter (Filing No. 41 at 11). Importantly, while Love offers explanations for her performance, she does not dispute any of the performance issues listed by Bratton in the Counseling and Action Plan (Filing No. 40-4 at 36:24-37:5).

While the Counseling and Action Plan was the first written indication of poor performance, Howard discussed concerns about Love's performance prior to the Counseling and Action Plan meeting. Bratton's failure to immediately communicate each performance concern is not enough to presume his proffered reasons were lies. *See Kralman v. Ill. Dep't of Veterans' Affairs*, 23 F.3d 150, 157 (7th Cir. 1994) (noting a bad business judgment on behalf of a decisionmaker is not enough to establish pretext).

Love has failed to establish a prima facie case that she was meeting State Bank's legitimate expectations, and her race discrimination claims fail on element two of the *McDonnel Douglas* framework.

### 2.  <u>Similarly Situated Individuals</u>

Even if Love had established that she was meeting her employer's expectations, she has not identified a similarly situated individual outside of her protected class that received better treatment. Love identifies Johnson, a Caucasian woman, as receiving extensive training compared to Love (Filing No. 32 at 2). Love argues that she and Johnson, the Staff Accountant, were similarly situated because they dealt with the same supervisors, were both subject to the employee handbook, and because Johnson engaged in comparable conduct (Filing No. 49 at 20).

State Bank argues that Love's attempt to use Johnson as a comparator fails for four reasons: (1) Johnson was a lower-level Staff Accountant with a different job function and role; (2) Love and Johnson were held to different standards because of their different roles; (3) Johnson does not have comparable experience to Love; and (4) there is no evidence that Johnson experienced any performance issues, let alone any of the same performance issues Love experienced (Filing No. 41 at 25–26).

The Court is not persuaded by Love's arguments for several reasons. First, Love and Johnson were hired for two different roles and held to two different standards. The job description for the Controller was to supervise the Staff Accountant and be the head of the accounting department. Thus, it is reasonable to expect the Controller to have a greater knowledge of accounting principles and require less training than the Staff Accountant. Further, Love's argument that this element is satisfied because she and Johnson were subject to the same employee handbook is misguided. As argued by State Bank, while all its employees are subject to the sane employee

handbook, there is no evidence that Love and Johnson were subject to the same performance standards ([Filing No. 52 at 5](#)).

Second, Love does not cite to, and the Court did not find, any evidence in support of Love's assertion that Johnson engaged in similar conduct but was not terminated. On the contrary, the evidence shows that Johnson had no issues with performance. Bratton testified that he did not need to use the training plan document with Johnson like he did with Love because Johnson caught on quickly ([Filing No. 40-1 at 11](#)). Bratton testified that Johnson "performed her job well and did not have any performance issues." *Id.* at 16. Moreover, Johnson was not placed on a Counseling and Action Plan for any performance issues. *See Hester v. Ind. State Dep't of Health*, 726 F.3d 942, 948 (7th Cir. 2013) (holding that a coworker was not comparable because the plaintiff had been placed on a "Work Improvement Plan," while the coworker was not and did not need to satisfy such conditions to remain employed). Johnson and Love are therefore not comparable.

Because Love and Johnson were hired for different roles, subject to different performance standards, and Johnson did not experience the same performance issues, Love has failed to establish that a similarly situated individual outside of her protected class was treated differently. Therefore, Love's claims also fail on element four of the *McDonnel Douglas* framework.

### 3. Pretext

Even if Love had satisfied the initial hurdle of establishing a four-part prima facie case of discrimination under the *McDonnell Douglas* framework, she cannot show that Bratton's proffered reasons for termination were pretext. To establish pretext, a plaintiff must identify such "weaknesses, implausibilities, inconsistencies, or contradictions" in the defendant's asserted reasons that a reasonable person could find them not credible and infer that the defendant did not act for the nondiscriminatory reasons asserted. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781,

792 (7th Cir. 2007). There are several ways that a plaintiff can prove pretext. A plaintiff can show the defendant was more likely than not motivated by a discriminatory reason. *Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 682 (7th Cir 2001). A plaintiff can prove pretext by showing that similarly situated employees outside of her protected class who engaged in similar conduct were treated more favorably. *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). A plaintiff can also prove pretext by showing that the defendant's proffered reason is unworthy of credence. *Gordon v. United Airlines, Inc.*, 246 F.3d 878; *Johnson v. Nordstrom, Inc.*, 260 F.3d 727 (7th Cir.2001). However, "[i]t is not the role of the court to determine whether an employer's expectations were fair, prudent, or reasonable." *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (citing *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 463 (7th Cir. 2014)). "So long as its management decision was not a guise for a discriminatory purpose, [the Court] must respect that decision." *Id.*

State Bank argues that Love cannot point to any evidence showing that Bratton's proffered reason for termination—Love's poor performance—was a lie or that such reasons were based on any racial animus (Filing No. 41 at 27). Love admits that neither Bratton nor anyone at State Bank ever made any racial comments to her. She argues in her response that (1) Bratton treated a similarly situated Caucasian employee, Johnson, better by training her more; and (2) because she was offered the demotion to a Staff Accountant position, "[i]f she truly struggled with fundamental accounting responsibilities as a Controller, it would be unreasonable to believe she could excel as a Staff Accountant." (Filing No. 49 at 19, 23-24).

The Court has already determined that Johnson and Love were not similarly situated employees, so Johnson's better training does not support pretext.

Love's speculation that Bratton would not have offered her a Staff Accountant position if he truly believed she was struggling with accounting principles is insufficient to withstand

summary judgment. *Gabrielle M. v. Park Forest-Chicago Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003) ("It is well established that in order to withstand summary judgment, the non-movant must allege specific facts creating a genuine issue for trial and may not rely on vague, conclusory allegations.") (citing Fed. R. Civ. P. 56(e)). The designated evidence shows that Bratton offered the Staff Accountant position to Love while telling her that he liked her personality, liked her story, and believed she could be great in a couple years—but did not feel Love was qualified for the Controller role. *Id*. Bratton also offered to continue to be a mentor and support Love through her next position. (Filing No. 49-1 at 128). Such statements are consistent with State Bank's proffered reasons for terminating Love. That is, Bratton liked Love, liked her story, and saw some future potential in her, was willing to mentor and support her—but could not keep her in the Controller position because he did not believe she possessed the requisite skills to head the accounting department and supervise the Staff Accountants.

Love argues that Bratton's statement that he was too busy with his COO and CFO roles to train Love is inconsistent with the fact that Bratton personally handled many of the Controller duties after Love was terminated (Filing No. 49 at 20). Love contends that this inconsistency undermines the credibility of the State Bank's justification for Love's termination and proves discrimination. The Court finds no inconsistency. It is undisputed that Bratton was handling both the COO and CFO roles, and thus he was credibly busy. There is no evidence that Love's proposed demotion or termination was motivated by a discriminatory reason, and there is no evidence that the stated reason was a lie. Rather, the designated evidence supports that the decision was based on Love's performance issues.

Love has failed to establish that State Bank's proffered reasons for offering her the choice between a demotion or termination was pretext for discrimination. Thus, Love's discrimination claims fail under the *McDonnell Douglas* framework.

### 4.  **The Evidence as a Whole**

Love's final pathway to surviving summary judgment is by showing that the evidence, when viewed as a whole, would lead a reasonable factfinder to conclude that she was terminated because of her race. *Ortiz*, 834 F.3d at 766. Love argues that by telling Howard that she felt she was being discriminated against and then later texting Howard that she felt she was being treated as a slave, Bratton's termination of her employment was discriminatory (Filing No. 49 at 17-18). Love also argues the timing of her termination was suspicious. *Id.* at 21.

State Bank contends that Bratton did not know of the racial nature of Love's alleged protected activity because neither Love nor Howard ever mentioned race to Bratton (Filing No. 52 at 12). Love admits that no one at State Bank ever made any racial comments towards her. To support her claims of race discrimination, Love argues that Howard mentioned to Bratton that Love felt she was providing more training to Johnson, but that conversation did not include any mention of race. Love also points out that she made Howard aware of her belief that she was being discriminated against because of her race, and she asserts that Howard was involved in the termination decision (Filing No. 49 at 21).  But Love has presented no evidence that Bratton was aware of her comments about race, or that Howard was a decision maker, and the evidence supports the opposite conclusion—that Bratton terminated Love's employment with no knowledge of any protected activity or any racial animus. Thus, the record is without evidence showing that Bratton terminated Love's employment due to any racial animus.

While Love is correct that suspicious timing may constitute circumstantial evidence of discrimination, such circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *Boss*, 816 F.3d at 917 (citation and internal quotation marks omitted). The Seventh Circuit has repeatedly held that "'[s]uspicious timing alone rarely is sufficient to create a triable issue' and on a motion for summary judgment 'mere temporal proximity is not enough to establish a genuine issue of material fact.'" *Cole v. Illinois,* 562 F.3d 812, 816 (7th Cir. 2009) (quoting *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008)). "Rather, a 'plaintiff must ordinarily present other evidence that the employer's explanation . . . was pretext for retaliation.'" *Riley v. City of Kokomo*, 909 F.3d 182, 188–89 (7th Cir. 2018) (quoting *Tibbs v. Admin. Off. of the Ill. Cts.*, 860 F.3d 502, 505 (7th Cir. 2017)) (omission in original).

Love argues the timing between her protected activity and the adverse employment action is suspicious. Love asserts that just hours after she complained to Howard, she was presented with an ultimatum: accept a demotion or face termination (Filing No. 49 at 21). Then, a mere two business days later, she was terminated. *Id.*

State Bank contends that Love's suspicious timing argument fails because it contradicts her own timeline of events. The Court agrees that Love's assertions conflict with her suspicious timing argument. It is undisputed that Bratton gave Love the ultimatum of being placed on the Counseling and Action Plan or accepting a demotion on January 5, 2023 (Filing No. 32 at 2). And it was not until January 19, 2023, that Love sent Howard the text message that Love felt like a slave. But even if Bratton had known about Love's text message to Howard on January 18, 2023, when he again gave Love the ultimatum of accepting a demotion or being terminated, the timing of Love's termination would not be suspicious because Bratton had already told Love that she needed to improve her performance, accept a demotion, or be terminated almost two weeks prior. The mere

temporal proximity of Love's text to Howard and her termination by Bratton is not enough to establish a genuine issue of material fact warranting a trial.

"Simply being a member of a protected class, without something more to link that status to the action in question, is not enough to raise a reasonable inference of discriminatory animus." *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 900 (7th Cir. 2016). Nothing in the record connects Bratton's actions to some form of racial animus or intent to discriminate based on race. "In determining whether [a party's] reason can be characterized as pretextual, [the Court] do[es] not evaluate whether the [party's] proffered justification was accurate or even whether it was unfair. [The Court's] sole focus is on whether the [party's] stated reason can be characterized as a falsehood rather than an honestly held belief." *Robertson v. Dep't of Health Services*, 949 F.3d 371, 378 (7th Cir. 2020). Love offered nothing more than the fact that she is a member of a protected class and her speculative hunch of race discrimination. This is not enough to defeat summary judgment. The Court concludes that the evidence, when viewed as a whole, could not lead a reasonable factfinder to conclude that Love was discriminated against. Love's claims therefore fail under either pathway, and State Bank is entitled to summary judgment on Love's race discrimination claims.

**B**.      **Retaliation Claims**

Love alleges that State Bank retaliated against her in violation of Title VII and § 1981 after she complained to Howard about race discrimination. Specifically, Love argues that she engaged in the protected activity of telling Howard in November 2022 that she was being discriminated against due to her race, and later in a January 19, 2023 text message, told Howard that she felt like a slave. Thereafter, a materially adverse action was taken by State Bank when she was terminated.

Title VII prohibits an employer from retaliating against an employee for engaging in conduct that is protected under the Act. *See* 42 U.S.C. § 2000e-3(a). A plaintiff may bring a retaliation claim using either the "direct" or "indirect method." *Mannie v. Potter*, 394 F.3d 977, 983 (2005). Under the "direct method," the plaintiff must set forth "evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Leonard v. E. Ill. Univ.*, 606 F.3d 428, 431 (7th Cir. 2010). The indirect method also requires the first two elements of the direct method, "'but instead of proving a direct causal link, the plaintiff must show that [s]he was performing [her] job satisfactorily and that [s]he was treated less favorably than a similarly situated employee who did not complain of discrimination.'" *Id.* (quoting *Stephens*, 569 F.3d at 786–87).

The Court has already determined that Love was not performing her job satisfactorily or being treated less favorable than a similarly situated employee, thus she cannot proceed under the indirect method. Accordingly, the Court will discuss whether there is a causal connection between Love's protected activity and her termination under the direct method.

State Bank argues that Love cannot establish a causal connection between Love telling Howard that she felt like a slave or that she felt race discrimination in her training because Bratton, the sole individual responsible for Love's termination, was never told and never knew about Love's protected activity. *Id.* at 29.

Love argues that she can establish a causal connection because State Bank's reasons for termination were pretextual and the timing between the protected activity and her termination were suspicious (Filing No. 49 at 19-21). Love cites the Seventh Circuit's decision in *Harper v. C.R. England, Inc.*, 687 F.3d 297 (7th Cir. 2012), arguing that suspicious timing can establish a causal connection. *Id.* at 18. Love overextends the Seventh Circuit's holding in *Harper*. In *Harper*, the

Seventh Circuit acknowledged that "'together with other facts, [suspicious timing] can sometimes raise an inference of a causal connection.'" *Harper*, 687 F.3d at 308 (quoting *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008) (alteration in original). However, the Seventh Circuit prefaced this by explaining that "[i]t is well established that 'mere temporal proximity between [the statutorily protected activity] and the action alleged to have been taken in retaliation for that [activity] will rarely be sufficient in and of itself to create a triable issue.'" *Id.* (quoting *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)) (second and third alterations in original).

Based on *Harper*, Love must provide other facts to support her argument that the suspicious timing between the protected activity and her termination leads to the conclusion of a causal connection, which she fails to do. Love contends that the Seventh Circuit in *Mclendon v. Indiana Sugars* held that a mere temporal proximity of two to three days was sufficient to establish a causal connection. 108 F.3d 789, 797 (7th Cir. 1997). However, this case is distinguishable from *Mclendon* because the superior in *Mclendon*, unlike Bratton, knew about the protected activity— filing a Title VII lawsuit against the defendant. *Id.* at 796.

Love has designated no evidence to show that Howard was a decision maker, and the evidence shows that she was not. Bratton and Howard both testified that the decision to offer the demotion and then terminate Love when she declined the offer were Bratton's decisions. Here, Bratton, the sole party responsible for Love's termination, testified that he had no knowledge of her protected activity, and Love has designated no evidence to dispute this. The evidence is that Howard relayed to Bratton that Love felt she was being treated differently than Johnson, but Howard never told Bratton that Love ever said anything about race or feeling like she was treated differently than Johnson because of her race (*see* Filing No. 41 at 20, Filing No. 40-1 at 14–15,

Filing no. 40-3 at 7–8, Filing No. 40-5 at 17). Love had several opportunities to complain to Bratton about race discrimination, but she did not do so during any of their meetings or in her detailed commentary/response to the Counseling and Action Plan.

Indeed, had Love told Bratton that she felt she was being treated like a slave only to be fired hours later, this might have been enough to survive summary judgment. But "[c]learly, a superior cannot retaliate against an employee for a protected activity about which he has no knowledge." *Stephens*, 569 F.3d at 788; *see also Treadwell v. Off. of the Ill. Sec. of State*, 455 F.3d 778, 782 (7th Cir. 2006); *Filipovich v. K & R Express Sys. Inc.*, 351 F.3d 859, 866 (7th Cir. 2004). Thus, the mere temporal proximity between Love's protected activity and her termination is not sufficient to establish a causal connection.

Love also maintains that the suspicious timing between her alleged protected activity and her separation demonstrates a causal connection (Filing No. 49 at 21). On reply, State Bank points out that Bratton's decision to offer Love a demotion or resignation was made two weeks before she sent her text message complaint to Howard, negating any causal connection between the two (Filing No. 52 at 15). Then, between that meeting and her termination, there were additional significant performance failures. Thus, even if Bratton had been aware of any protected activity, those significant intervening events negate any causation. *Id.* The Court agrees. *See Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 937 (7th Cir. 2022) (ruling that a period of two days between the protected activity and termination was insufficient to save the plaintiff's claim from summary judgment); *Riley*, 909 F.3d at 188–89 (drawing a distinction between "mere temporal proximity" and suspicious timing, and ruling that temporal proximity is not sufficient to establish a genuine issue of material fact). Love has failed to establish a causal connection between the protected

activity and her termination. Accordingly, her retaliation claims fail under the third element of the direct method.

In addition, considering the evidence as a whole would not permit a reasonable factfinder to conclude that State Bank retaliated against Love for engaging in protected activity. Because Love cannot show retaliation under any method, and State Bank's Motion for Summary Judgment is **granted** as to her retaliation claims.

## IV.    <u>CONCLUSION</u>

The Court has looked at the direct and indirect evidence together as a whole and determined that it would not permit a reasonable factfinder to conclude that Love's race caused her termination. And no reasonable factfinder could determine that Love's report to Howard that she felt discriminated against, rather than Love's performance, was the "but for" cause of State Bank's decision to terminate Love. For reasons explained in this Order, State Bank's Motion for Summary Judgment (Filing No. 39) is **GRANTED**.

Final Judgment shall issue in a separate order.

**SO ORDERED.**

Date:    5/29/2025

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

Amber K. Boyd
Amber Boyd Attorney at Law
amber@amberboydlaw.com

Raymond D. Faust
Amundsen Davis LLC
dfaust@amundsendavislaw.com

Debra Ann Mastrian
Amundsen Davis, LLC
dmastrian@amundsendavislaw.com

Lauren M. Thompson
Amber K. Boyd Attorney at Law
lauren@amberboydlaw.com